IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAVIER AYALA, | § | |
| | § | No. 103, 2018 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID: 1507021247A&B |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: November 28, 2018
Decided: February 11, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED**.

Bernard J. O'Donnell, Esquire and James O. Turner, Jr., Esquire, (argued), Office of the Public Defender, Wilmington, Delaware, for Appellant, Javier Ayala.

Carolyn S. Hake, Esquire, Department of Justice, Wilmington, Delaware, for Appellee, State of Delaware.

**TRAYNOR**, Justice:

In July 2015, police officers stopped Javier Ayala for driving a vehicle with a suspended license. During a search of his vehicle and a subsequent search of his home under a previously issued warrant, officers found a .22-caliber pistol and 1,286 bags of heroin. The net weight of the bags' contents was approximately 15 grams. In separate trials, two juries convicted Ayala of multiple charges relating to the contraband police found in Ayala's home and vehicle. Because Ayala had been previously convicted of four other felonies, the Superior Court declared Ayala to be a habitual offender under 11 *Del C.* § 4214 and sentenced him to a mandatory minimum prison term of seven years and six months.

On appeal, Ayala challenges his convictions and sentence on two grounds. First, he contends that the Superior Court abused its discretion when it admitted evidence regarding the identity and weight of the substance in the bags seized from his home and vehicle because the chemist who tested the suspected heroin bags did not lay a proper foundation for the admission of her hypergeometric-testing results. Second, Ayala argues that, as a matter of law, he should not have been adjudged a habitual offender because the offenses forming the basis of three of his predicate felony convictions were no longer felonies when he was sentenced in this case.

We have concluded that the chemist's testimony regarding her testing procedures, while less than ideal, was not so deficient as to render the admission of the testing results an abuse of the Superior Court's discretion. And despite the

General Assembly's reform of our drug laws in 2011 such that three of Ayala's predicate felony convictions are no longer felonies and no longer defined as distinct offenses, Ayala is nevertheless subject to sentencing as a habitual offender under 11 *Del. C.* § 4214 because he had been three times convicted of a felony and was thereafter—in this case—convicted of a subsequent felony.

## I. BACKGROUND

On July 27, 2015, Wilmington Police were conducting surveillance on 1002 Sycamore Street. They suspected that Ayala lived there and that he was dealing drugs. Accordingly, police had obtained a search warrant for 1002 Sycamore Street.

While surveilling the home, police officers saw Ayala leave the residence and drive away in a minivan. Because the officers knew that Ayala's driver's license was suspended, they stopped him on a nearby street. The officers searched the car and found a bundle of 50 bags of individually packaged suspected heroin doses in the passenger compartment of the minivan near the center console.

The officers then took Ayala to their headquarters and called additional officers to conduct the search of 1002 Sycamore Street. Inside 1002 Sycamore Street, officers found another, larger bundle containing 1,236 bags of suspected heroin and a .22-caliber semiautomatic pistol. At headquarters, Ayala admitted that the bundles of heroin and the gun were his and that he intended to sell the heroin.

3

The police turned the seized drugs over to the Delaware Division of Forensic Science ("DFS") for forensic testing. The task of testing the evidence against Ayala was assigned to Ashley Wang, a forensic chemist at DFS. After conducting a series of tests using a process called "hypergeometric testing," Wang issued a report indicating that she was confident that the bags police seized from Ayala contained heroin and so testified at trial.

Ayala was indicted on charges of Drug Dealing, Aggravated Possession of Heroin, Driving a Vehicle While License is Suspended or Revoked, Possession of a Firearm by a Person Prohibited, Possession of Ammunition by a Person Prohibited, and Endangering the Welfare of a Child. Ayala was tried in two separate trials after the Superior Court granted his motion to sever the person-prohibited and child-endangering charges[1] and was convicted on all counts.

Before sentencing, the State moved to declare Ayala a habitual offender. The Superior Court granted the State's motion and sentenced Ayala to a mandatory minimum of seven-and-one-half years' imprisonment on the possession-of-a-firearm-by-a-person-prohibited offense, followed by suspended terms of imprisonment on the remaining criminal offenses, and a fine on the traffic offense.

---

[1] In Ayala's first trial, the jury could not reach a unanimous verdict and the judge declared a mistrial. At retrial, Ayala was tried for and convicted of the controlled substance and traffic offenses. In the next trial, Ayala was convicted of the person-prohibited and child-endangering offenses.

4

among other punishments. Ayala timely appealed his conviction and sentence to this Court.

On appeal, Ayala argues that the Superior Court abused its discretion when it admitted Wang's testing results. Ayala contends that, because Wang could not remember how she randomly selected her samples, her results lacked a proper foundation and should not have been admitted. Ayala also contends that he should not have been adjudged a habitual offender. We address both contentions in turn, but first we review the nature of hypergeometric testing and Wang's testing procedures in Ayala's case.

## A. Overview of hypergeometric testing

Essentially, hypergeometric[2] testing randomly selects a small sample from a larger population, tests that sample, and extrapolates the sample results to the larger population. Hypergeometric testing is based on the frequentist approach to

---

[2] The term "hypergeometric" derives from the fact that the relevant statistical probability distribution describing the likelihood of having a particular number of positive results when drawing—without replacement (*i.e.*, the experimenter does not put back samples they selected back into the testing population before drawing the next sample)—from a finite population containing a total proportion of positive results is called a hypergeometric distribution. That method of drawing without replacement is the basis of hypergeometric testing. *See* Eric W. Weisstein, Wolfram MathWorld*, Hypergeometric Distribution*, *available at* http://mathworld.wolfram.com/HypergeometricDistribution.html. In turn, the hypergeometric distribution appears to be named for the fact that the mathematical generating function for that probability distribution involves hypergeometric functions, which themselves were so named in the 18th century. *See* Eric W. Weisstein, Wolfram MathWorld*, Hypergeometric Function*, *available at* http://mathworld.wolfram.com/HypergeometricFunction.html (citing WILFRID NORMAN BAILEY, GENERALISED HYPERGEOMETRIC SERIES 4–5. (1935).

statistics.[3]   As applied to the testing of suspected controlled substances, "[t]he assumption behind a frequentist approach is that a fixed but unknown proportion of the seizure contains drugs.  The proportion of drugs in . . . the sampled units[] can estimate this seizure proportion.  The proportion of drugs in the sample will, however, vary over different samples.  Therefore, the frequentist methods provide a confidence . . . that with a given sample proportion," drugs constitute some particular proportion of the entire seizure.[4]   For example, after hypergeometric testing of a drug seizure, a chemist may be able to infer—as Wang did here—that at least 90% of that drug seizure contains drugs at a 95% "confidence level."[5]

---

[3] European Network of Forensic Science Institutes, *Guidelines on Sampling of Illicit Drugs for Qualitative Analysis* ("ENFSI Guidelines" hereafter) 16–17 (2d ed. 2016).  The ENFSI Guidelines are widely accepted and have been widely adopted.  *See, e.g.*, United Nations Office on Drugs and Crime, Guidelines on Representative Drug Sampling iii (2009); Scientific Working Group for the Analysis of Seized Drugs, Department of Justice, *Recommendations Version 7.1* 10–11 (2016).

[4] *ENFSI Guidelines*, *supra* note 3, at 16–17.

[5] Confidence level is a term of art.  In her testimony, Wang went further than "confidence level," however: Wang also testified that "there is a 95% *likelihood* that at least 90% of the samples submitted contain [heroin]." *Infra* note 13 (emphasis added).  But based on our understanding of hypergeometric testing principles and the term "confidence level," we question whether that is entirely accurate.  It seems to us it would have been more accurate for Wang to say that were she to run her tests *again*, then there is at least a 95% likelihood that the *subsequent* test's confidence interval would contain the true proportion of heroin in the seizure. *See* National Institute of Standards and Technology, Department of Commerce, *NIST/SEMATECH e-Handbook of Statistical Methods* § 1.3.5.2. ("As a technical note, a 95% confidence interval does **not** mean that there is a 95% probability that the interval contains the true mean.") (emphasis in original).  *See also* Jerzy Neyman, *Outline of a Theory of Statistical Estimation Based on the Classical Theory of Probability*, 236 PHIL. TRANSACTIONS OF THE ROYAL SOC'Y OF LONDON 330, 349 (1937). ("The parameter [being estimated] is an unknown constant and no probability statement concerning its value may be made . . . .").  But Ayala did not challenge this specific aspect of Wang's testimony, so we need not discuss it further.

When performing hypergeometric testing of a batch of drugs, the chemist first separates the seized items (here, the suspected heroin bags) into externally homogeneous groups, or "populations."[6]  Next, the chemist counts the number of individual units within each population and uses a table based on the hypergeometric distribution to determine the appropriate number of samples to test from that population.  The chemist then randomly selects that number of samples from the population to test.  Finally, the chemist conducts the relevant tests and extrapolates the sample results to the population.

The randomness of the samples is crucial.[7]  Each unit in the population must have an equal chance of being selected for the samples to be a true reflection of the properties of the population.[8]  Arbitrary, nonstandardized methods of selecting samples lend themselves to error.[9]  For example, "it happens that sometimes the expert tends to choose similar sized units."[10]  It follows, then, that a reliable hypergeometric test requires a reliable method of randomly selecting the samples.

---

[6] *ENFSI Guidelines*, *supra* note 3, at 12–13.
[7] *Id*.
[8] *Id*. at 12.
[9] *See* Amos Tversky & Daniel Kahneman, *Judgment under Uncertainty: Heuristics and Biases*, 185 SCIENCE 1124, 1030, 1031 (1974) (people, including "[e]xperienced researchers," make "systematic and predictable errors" when attempting to create or interpret randomness); Amos Tversky & Daniel Kahneman, *Belief in the Law of Small Numbers*, 76 PSYCHOL. BULL. 105 (1971).
[10] *ENFSI Guidelines*, *supra* note 3, at 12.

## B. Wang's procedures and testimony

Wang testified on *voir dire* that, although she had no specific recollection of performing the random selection of samples and did not record her exact testing procedures in her written report in Ayala's case, her usual protocol is to sort and separate the drug seizure into homogeneous populations by appearance and provenance. She next weighs each population in a weigh boat. Then, she dumps the populations onto her lab bench into separate piles. Wang then refers to a testing manual for the appropriate number of samples to draw and test from each population. Wang could not recall how she drew the samples in Ayala's case—she said she had "no specific procedure."[11] But it appears that she unsystematically—Wang insists that it was randomly and in accordance with the way she does it in every case[12]—drew the requisite number of samples from the piles that she had dumped out. As mentioned, Wang eventually tested 62 of the 1,286 bags seized and detected heroin in every sample. She concluded that that "there is a 95% likelihood that at least 90%

---

[11] App. to Op. Br. A29–30 ("A__" hereafter) ("I have no specific procedure to tell you how I randomly sampled. . . . I cannot tell you how I randomly sampled because it was random . . . . That's the nature of it being random, there is no specific method or procedure to randomly sample.").

[12] *Id*.

of the [seizure] submitted contain [heroin]" [13] and that the net weight of the entire drug seizure was approximately 15 grams.[14]

Ayala sought to exclude Wang's conclusion on the grounds that the State had not offered sufficient evidence that Wang's methods ensured the homogeneity of each testing population or the randomness of the tested samples, and thus the foundation for her testimony was insufficient. The Superior Court disagreed with Ayala's contention that this foundational testimony regarding Wang's random selection of samples was insufficient and permitted Wang to testify.

## II. AYALA'S EVIDENTIARY OBJECTION

### A. Ayala's challenge

On appeal, Ayala makes two related arguments relating to Wang's random selection. According to Ayala, Wang's inability to remember how she randomly selected the samples for her hypergeometric tests rendered her testimony unreliable. Furthermore, according to Ayala, the Superior Court erred by reasoning that, because Wang's groupings were sufficiently homogeneous, the importance of the

---

[13] App. to Answering Br. B36 ("B__" hereafter).

[14] The State contends that Ayala failed to raise the weight issue below and cannot raise it on appeal absent a showing of plain error. Because we conclude that Ayala's challenge fails on the merits, in the interest of judicial efficiency, we do not reach the procedural issue of whether Ayala raised weight or only identity below. That said, we note that, contrary to the State's contentions, it appears that hypergeometric testing was used to determine the weight of the heroin in Ayala's case and that Ayala's challenge to whether Wang's technique implemented that method was reliable extends to all her results, including weight. It appears to us that Wang used the samples to determine the weights of the heroin and of the bags that she sampled and then extrapolated those weights to the entire population.

9

precise method of random selection was diminished. Such reasoning, Ayala contends, impermissibly eliminated the requirement of random selection from hypergeometric testing as a practical matter.

Ayala appears to maintain only his challenge to the sufficiency of Wang's random selection procedure and, in particular, her inability to recall her actual performance; he does not challenge the validity of properly conducted hypergeometric testing. Therefore, we do not address hypergeometric testing's general validity or admissibility, but only whether—assuming that the results of properly conducted hypergeometric testing are admissible—the State laid a sufficient foundation for the admission of Wang's opinion.

## B. Evidentiary standards and standard of review

Under Delaware Rule of Evidence 702, an expert witness may give opinion testimony if "the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case."[15] When courts evaluate preliminary questions on evidence such as whether evidence is admissible, they are not subject to ordinary rules of evidence and may evaluate evidence otherwise not admissible.[16]

---

[15] D.R.E. 702(b)–(d).
[16] D.R.E. 104(a).

In determining whether expert testimony on a scientific, technical, or other specialized matter is admissible, the trial judge acts as a gatekeeper.[17] The trial judge does not assess weight or credibility *per se*,[18] but only whether the proponent has demonstrated, by a preponderance of the evidence, that the proffered testimony is relevant and sufficiently reliable.[19] As the Third Circuit Court of Appeals has stated, "the grounds for the expert's opinion merely have to be good[;] they do not have to be perfect."[20] And "trial courts should hesitate to exclude evidence . . . based on questions as to [reliable application] that are within the jury's ability to understand."[21] Accordingly, admission of expert witness testimony requires reliability, not infallibility.[22]

Relatedly, the proper conduct of scientific testing rests on three elements: (1) that all instruments used were in proper working order; (2) that proper procedure was followed; and (3) that the test was conducted by qualified individuals.[23] As

---

[17] *M.G. Bancorporation*, 737 A.2d at 522.

[18] *Hall v. State*, 788 A.2d 118, 124 (Del. 2001) (weight and credibility of evidence are issues for the jury).

[19] *Price v. Blood Bank of Delaware, Inc.*, 790 A.2d 1203, 1210 (Del. 2002).

[20] *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994).

[21] 29 CHARLES A. WRIGHT ET AL., FED. PRAC. & PROC. EVID. § 6268.2 (2d ed.).

[22] *See Price*, 790 A.2d at 1210; *accord United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992); *United States v. Alexander*, 526 F.2d 161, 164 n.3 (8th Cir. 1975); *State v. Lyons*, 924 P.2d 802, 813 (Or. 1996) ("Courts do not require that scientific tests be infallible to be admissible. Only reasonable certainty must follow from the tests").

[23] *See* 1 EDWARD J. IMWINKELREID ET AL., COURTROOM CRIMINAL EVIDENCE § 626–29 (4th ed. 2005).

noted, Ayala does not challenge the admissibility of properly conducted hypergeometric testing, nor does he challenge the condition of Wang's instruments or Wang's qualifications. Accordingly, we examine only whether the State sufficiently established that Wang in fact conducted the testing properly.[24] Finally, because this is a ruling concerning the admissibility of expert witness testimony, we will reverse only if we find abuse of discretion.[25]

## C. Wang's lack of recollection did not fatally undermine the foundation for her testimony

As mentioned, Wang had no independent recollection of performing the random selection of the suspected heroin bags after separating the seized bags into homogeneous populations. Instead, she described the standard way that she routinely performs this part of the testing process and confirmed that she always follows that routine. Relying on our holding in *Fensterer v. State*,[26] Ayala argues that Wang's inability to remember her exact procedures fatally undermines her testimony. We disagree. In *Fensterer*, we held that Rule 705 of the Delaware Uniform Rules of Evidence did not permit the admission of the testimony of an FBI

---

[24] D.R.E. 702 ("a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise, if . . . the witness has applied the principles and methods reliably to the facts of the case").

[25] *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 522 (Del. 1999).

[26] 509 A.2d 1106 (Del. 1986).

special agent who could not remember which of three potential observations he made formed the basis of his conclusion that a victim's hair had been forcibly removed.[27]

But here, the issue is not that Wang could not remember what observations she made. Wang's observations, *i.e.*, the weight and contents of the tested bags, were recorded and made part of the trial record. Those observations were the basis of Wang's conclusion that the police had seized 15 or more grams of heroin. The question that Ayala raises is whether, in light of Wang's inability to specifically recall her performance of the testing in this case, the trial court could make the preliminary determination that those observations were formed in a sufficiently reliable way, which simply was not the question in *Fensterer*. On this key point, the State provided evidence of Wang's usual testing procedure. And in the absence of evidence to the contrary, it was reasonable for the trial judge to infer that Wang followed her usual procedure despite her inability to recall her particular actions in Ayala's case.[28] Accordingly, we do not think that Wang's memory lapse so undermined the foundation of her testimony that it was rendered inadmissible.

Moreover, we agree with the Superior Court's observation that the precise manner in which random selection is performed is of diminished importance, where,

---

[27] *Id*. at 1109.
[28] *See McConnell v. State*, 1994 WL 43751, 639 A.2d 74 (Del. 1994) (Table) ("In the absence of evidence to the contrary, there is a presumption that the State Chemist acted carefully and in a prudent manner.").

13

as here, there has been a threshold showing of the homogeneity of the population to the trial judge acting as gatekeeper. The recommendations for well-defined random-selection procedures are based on the concern that, if the tested population is not truly homogeneous, the technician might choose samples that, based on outward appearance, are more or less likely to contain contraband than the population as a whole. Where the population is truly homogeneous and previously randomly shuffled (as dumping all the bags onto a lab table before selecting the sample group would tend to do), then the random selection method would necessarily be less likely to affect testing reliability.[29]

Finally, although on appeal Ayala does not mount a frontal attack on Wang's usual procedures for ensuring population homogeneity and randomly selecting samples, choosing instead to focus on Wang's lack of specific recall of how she performed those steps in this case,[30] the adequacy of Wang's procedures warrant brief consideration here.

---

[29] As an illustration, selecting the top five cards from a well-shuffled deck of cards is as random as selecting five random cards from that deck.

[30] *See* Op. Br. 6 ("The question is, *given [Wang's] inability to recall how she had randomly sampled the individual amounts of suspected controlled substances* in question in order to determine the quantity by weight of controlled substances in the Defendant's possession, whether her testimony concerning the total amount weight of the controlled substances should have been admitted into evidence.") (emphasis added). Ayala makes only fleeting references to the inadequacy of Wang's usual procedures, which, according to Wang, she followed in this case.

14

It is well-established that humans are not naturally skilled at judging and producing randomness,[31] and in the field of hypergeometric testing there appear to be preferred methods for ensuring that the selection of samples is in fact random.[32] Indeed, the widely accepted guidelines for hypergeometric testing published by the European Network of Forensic Science Institutes suggest two methods for conducting a random selection.[33] The first entails numbering each item in the population to be tested and then using a computer to generate a set of random numbers to choose the samples for testing. The second—known as the "black box" method—entails placing the population in a box and having the experimenter blindly draw a set of items from that box. But those guidelines do not mandate either the numerical or the black-box method for random sampling; what is necessary is simply some reliable method for producing randomness that is not subject to the well-documented fallibilities and foibles of the human experimenter.

Here, we conclude that Wang's failure to use a recommended method for random selection in this case—a practice apparently blessed by DFS—was not fatal to the admission of her testimony. Although we have excluded evidence for failure to follow proper testing procedure, in those cases the defendant showed that the State

---

[31] *Supra* notes 9–10 and accompanying text.
[32] Contrary to Wang, we do not believe that random sampling entails, by "nature. . . , no specific method or procedure." A29–30.
[33] *ENFSI Guidelines*, *supra* note 3, at 13–14.

violated unambiguous manufacturer instructions for producing reliable test results.[34]

Ayala has only produced non-binding guidelines that themselves state that other methods can produce sufficient randomness for reliable test results. He has not produced any affirmative evidence that Wang's methods seriously undercut the reliability of her results. Given the lack of established rules regarding random selection, the weaknesses in Wang's testimony did not go to the testimony's admissibility, but rather to its weight, which is a question for the jury.[35] It bears repeating that, as a gatekeeper, the trial court is looking for reliability, not infallibility.

In addition, proper hypergeometric testing procedure requires separation of the drug seizure into homogeneous groups for sampling. For example, a seizure containing bags of similar size but with half labeled "Jaguar Blue" and the other half labeled, say, "Jaguar Red" should be separated into two groups for testing so that the testing can determine the characteristics of each group.[36]

---

[34] *See, e.g.*, *Clawson v. State*, 867 A.2d 187 (Del. 2005) (excluding intoxilyzer evidence because the police observed the defendant for only 19 minutes before testing him in contravention of the manufacturer's requirement of 20 minutes); *Hunter v. State*, 55 A.3d 360 (Del. 2012) (excluding blood test evidence because a phlebotomist used an expired blood draw tube and shook the vacuum tube "vigorously" in direct violation of the manufacturer's instructions).

[35] We note that, after overruling Ayala's objection, the trial court encouraged robust cross-examination on this issue. A68. And indeed, Ayala's attorney spent a substantial amount of time cross-examining Wang, A91–110; 117–26, and he spent nearly his entire closing argument arguing against the reliability of Wang's results, Trial. Tr. 239–45 (Oct. 11, 2016).

[36] For example, suppose only "Jaguar Blue" contains heroin. Testing the two groups together would indicate that around half of the seizure contains heroin, but would not indicate which bags between "Jaguar Blue" and "Jaguar Red" in fact contained the heroin, a matter that would be especially important if the two groups had different content weights.

16

We cannot say that Wang's testimony in this area did not give us pause. For instance, Wang admitted to grouping together bags that looked different, with what was suspected to be heroin visible in some bags and hidden in others by the packaging. Wang dismissed these differences by saying that the packaging material was identical even if there were differences in the way the alleged heroin was placed in the packaging and that those latter differences are immaterial. We understand, however, that visible differences in the bags' contents are relevant to their homogeneity or lack thereof, and bags with visible differences should be sorted into separate groups.

Nevertheless, although Wang could not specifically recall separating the seized bags into homogeneous groups in this case, she did note that her usual practice, which she says she follows in every case, is to examine each bag individually to ensure that there is a powder inside that is consistent with the others in the population. Such a practice can mitigate the risk of heterogeneity. Moreover, there was nothing in Wang's testing results that suggested that her groups were anything but homogeneous.

Ultimately, while Wang's procedures and foundational testimony might not have been flawless, the State made an adequate showing that Wang's results were reliable enough for admission. In sum, we conclude that the Superior Court did not abuse its discretion when it admitted Wang's testimony.

17

## III. AYALA'S HABITUAL OFFENDER STATUS

Ayala also challenges the Superior Court's finding that he was a habitual offender under § 4214 and therefore subject to enhanced sentencing. Ayala says that this finding was erroneous because Delaware recategorized[37] several of the predicate felonies that the Superior Court used to determine that he was a habitual offender. Because this question involves the application of law to undisputed facts, our review is *de novo*.[38]

### A. Ayala's previous convictions and § 4214's sentencing enhancements

Under the version of 11 *Del. C.* § 4214 that the Superior Court applied to Ayala, "any person who has been 3 times convicted of any felony under the laws of this State . . . and who shall thereafter be convicted of a subsequent felony is declared to be a[] habitual criminal" and is subject to enhanced sentences.[39] In particular, if the offender's subsequent felony is a violent felony as defined in 11 *Del. C.* § 4201(c), the offender is subject to a "minimum sentence of 1/2 of the statutory maximum penalty . . . ."[40] Under § 4201(c), both possession of a firearm by a person prohibited and possession of ammunition by a person prohibited qualify as violent felonies, and therefore Ayala was subject to enhanced sentencing if he had three

---

[37] *Infra* notes 45–47 and accompanying text.
[38] *Butcher v. State*, 171 A.3d 537, 539 (Del. 2017).
[39] 11 *Del. C.* § 4214(a). Section 4214(a) has been amended several times in recent years. 81 Del. Laws, c. 6 § 1; 80 Del. Laws, c. 321 § 1; 79 Del. Laws, c. 321 § 1.
[40] 11 *Del. C.* § 4214(b).

prior felony convictions.  Prior to his 2015 arrest, Ayala had been convicted of four

felonies:

- Possession with intent to deliver cocaine (1993)[41]

- Possession of a controlled substance within 300 feet of a park ("possession near a park") (1999)[42]

- Use of a dwelling for keeping controlled substances ("maintaining a dwelling") (2009)[43]

- Use of a dwelling for keeping controlled substances (2011).[44]

In 2011, Delaware enacted the Ned Carpenter Act.[45]  The Act eliminated the

offenses of possession near a park[46] and maintaining a dwelling[47] but did not apply

retroactively to any violation that occurred prior to September 1, 2011.[48]

---

[41] 16 *Del. C.* § 4751 (1993).
[42] 16 *Del. C.* § 4768 (1998).
[43] 16 *Del. C.* § 4755 (2009).
[44] 16 *Del. C.* § 4755 (2011).
[45] 78 Del.  Laws, c. 13 ("Ned Carpenter Act" hereafter) (amending various sections of titles 10, 11, 16, and 21 of the Delaware Code relating to drug offenses).
[46] *Id*. at § 43 ("Amend § 4768, Title 16 of the Delaware Code [criminalizing, *inter alia*, possession of controlled substance within 300 feet of park] by striking said Section in its entirety"). Possession *in* a park is now an aggravating factor under 11 *Del. C.* § 4751A for various drug offenses, including possession of a controlled substance, which is now codified under 11 *Del. C.* § 4763 and is a misdemeanor.
[47] The Act replaced this offense with a new offense that requires felony drug conduct on the premises instead of mere misdemeanor possession as was formerly the case. *Ned Carpenter Act*, *supra* note 45, at § 46(v) ("striking subsection (a)(5) [criminalizing maintaining a dwelling] in its entirety"); *id*. at § 56 ("Any person . . . who knowingly consents to the use of [their] property by another for the manufacture of, delivery of, or possession with the intent to manufacture or deliver, controlled substances, shall be guilty of a class F felony.").  Essentially, the Ned Carpenter Act modified the offense to require manufacture, delivery, or possession with intent to manufacture or deliver within a residence instead of mere possession.  No party before us argues that the new offense is "the same, or equivalent to" the old offense, and for purposes of this opinion, we assume that they are not "the same, or equivalent."
[48] *Id*. at § 66; 11 *Del. C.* § 4791(a).

19

On appeal, Ayala argues that because possession near a park and maintaining a dwelling were no longer felonies at the time of his sentencing, he should not be subject to § 4214's sentencing enhancements. The State replies that because Ayala's predicate acts were felonies when Ayala was convicted of those predicates, it is irrelevant that Delaware later recategorized such offenses or eliminated them as discrete offenses altogether.

## B. Section 4215A

The State and Ayala both contend that 11 *Del. C.* § 4215A support their positions that Ayala is and is not subject to enhanced sentencing, respectively. In our opinion, however, § 4215A supports neither position and is inapposite to Ayala's sentencing.

Section 4215A, which is entitled "Sentence of greater punishment because of previous conviction under prior law or the laws of other jurisdictions," states in relevant part:

> [A] previous conviction shall make the defendant liable to . . . greater punishment if that previous conviction was . . . [f]or an offense specified in the laws of this State or for an offense which is the same as, or equivalent to, such offense as the same existed and was defined under the laws of this State existing at the time of such conviction.[49]

We think the only sensible way to read § 4215A is as follows:

---

[49] 11 *Del. C.* § 4215A(a).

20

A previous conviction shall make the defendant liable to greater punishment if that previous conviction was [1] for an offense [currently] specified in the laws of this State or [2] for a [previously specified] offense which is the same as, or equivalent to, [a currently specified] offense as [that] same [previously specified offense] existed and was defined under the laws of this State existing at the time of [the previous] conviction.

In other words, we think that § 4215A says that a previous conviction makes the defendant subject to enhanced sentencing for his current conviction if his *previous* conviction was either (1) for an offense still specified as an offense at the time of sentencing or (2) for an offense that is "the same as, or equivalent to" an offense still specified as an offense at the time of sentencing.

Ultimately, § 4215A is irrelevant to Ayala's case because it is a non-exclusive provision that permits enhanced sentences when a person has been previously convicted of offenses still specified under the Delaware Criminal Code as offenses, or when they have been previously convicted of an offense that has a "same" or "equivalent" analog under current law, neither of which is the case here. We therefore agree with the Superior Court's conclusion that § 4215A provided "no aid" to Ayala.[50]

But we also reject the State's contention that § 4215A dictates that Ayala's possession-near-a-park and maintaining-a-dwelling convictions are predicate

---

[50] The Superior Court concluded—as do we—that "such conviction" in 4215A referred to the previous conviction, not the conviction at hand for which the defendant is being sentenced.

felonies in this case. It bears noting here that in the Superior Court, the State explicitly argued that "§ 4215A . . . is not applicable under these circumstances."[51] The Superior Court implicitly agreed,[52] and for the reasons stated above, we also agree.[53]

## C. Section 4214

Instead of relying on the relatively obtuse language of § 4215A, which, as noted, does not address the scenario presented in this case, we employ a straightforward application of § 4214 to reach the same result as the Superior Court. As noted above, § 4214 renders "any person who has been 3 times convicted of any felony under the laws of this State" subject to habitual offender status and enhanced sentencing.[54] Ayala undeniably had been convicted three times of Delaware felonies. Indeed, when asked during oral argument, Ayala's attorney agreed that Ayala satisfied § 4214's enumerated requirements:

---

[51] A150.

[52] Letter Op., N1507021247A (Dec. 8, 2017), available at A152–53.

[53] *Butcher v. State*, 171 A.3d 537 (Del. 2017) is inapposite. *Butcher* dealt with the meaning of "violent felony" as used in 11 *Del. C.* § 1448(e). But § 1448 explicitly instructs us to inspect § 4201(c) for the meaning of "violent felony," an inspection that we accordingly conducted in *Butcher*. *Id*. at 543–44. There are no similarly explicit intertextual references in § 4215A (unlike in § 4214, which we discuss next). We noted in *dicta* that "[s]ound policy reasons (as embedded in Section 4215A) militate against such *post hoc* challenges to convictions where the elements defining the predicate offense may have changed. *Id*. at 543 n.34. It is apparent the *Butcher dicta* speaks to different issues than those in the case before us.

[54] *Supra* notes 39–40 and accompanying text.

Q: . . . 4214(b) applies to persons who have been three times convicted of a felony under the laws of this state. Does that accurately describe your client at the time of the triggering conviction?

A: It does, your honor.[55]

The unambiguous language of § 4214 compels the conclusion that the Superior Court correctly declared Ayala a habitual offender and correctly imposed a mandatory minimum sentence.

## IV. CONCLUSION

Because the Superior Court did not abuse its discretion in admitting Wang's hypergeometric testing results and properly applied the enhanced sentencing provisions of 11 *Del. C.* § 4214, the judgment of the Superior Court is affirmed.

---

[55] Oral Arg. 10:49–11:09 (Nov. 28, 2018).