IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEPHEN HECK, | § | |
| | § | No. 79, 2025 |
| Defendant Below, Appellant, | § | |
| | § | Court Below–the Superior |
| v. | § | Court of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. N2310001233 |
| | § | |
| Appellee. | § | |
| | § | |

Submitted: January 21, 2026
Decided: April 17, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en banc*.

## <u>ORDER</u>

After careful consideration of the parties' briefs and the record on appeal, and following oral argument, it appears to the Court that:

(1)    In this appeal, Stephen Heck challenges his criminal conviction for the murder of his girlfriend, Cynthia Amalfitano.  For the reasons stated below, we affirm.

## BACKGROUND

(2)    Heck and Amalfitano began dating in 2020, just before the pandemic.[1]  On Saturday, September 23, 2023, the pair planned to travel to Amalfitano's Rehoboth

---

[1] App. to Opening Br. at A355 [hereinafter "A__"] (Trial Tr. 76:20–22) (Sandra Saienni) [hereinafter "Tr."].

Beach condominium for a weekend getaway.[2]  Before leaving for the beach, Amalfitano had texted Heck, "okay sweetie see you in a bit."[3]

(3)    Amalfitano did not report to work on the following Monday. Amalfitano's boss contacted her family to check on her because she had not requested the day off.[4]  Her sister, Sandra Saienni, tried calling Amalfitano and Heck, but neither answered their cell phones.[5]  Heck eventually called back but hung up without saying a word.[6]

(4)    Amalfitano's sister-in-law, Donna Galliani, went to Amalfitano's New Castle County residence to look for her.[7]  Galliani went to the rear of Amalfitano's home and knocked on the back door, but no one answered.[8]  Galliani found this odd because Amalfitano's Jeep was sitting in the parking lot.[9]  Galliani tried to open the back door, found it unlocked, and walked inside.[10]  Galliani found no sign of Amalfitano.[11]  She discovered Amalfitano's two dogs unattended, which was strange

---

[2] A359–60 (Tr. 80:20–81:14) (Sandra Saienni).

[3] A83 (Aff. in Support of an Application for Warrant ¶ 25) [hereinafter "Aff."].

[4] A315–16 (Tr. 36:15–37:7) (Lori Bigalow).

[5] A360–61 (Tr. 81:19–82:7) (Sandra Saienni).

[6] *Id.*

[7] A402 (Tr. 123:3–11) (Donna Galliani).

[8] A402 (Tr. 123:18–19) (Donna Galliani).

[9] A402–03 (Tr. 123:12–124:13) (Donna Galliani).

[10] A402 (Tr. 124:1–3) (Donna Galliani).

[11] A403 (Tr. 123:3–11) (Donna Galliani).

2

because one of the dogs never left Amalfitano's side.[12]  Galliani also found Amalfitano's luggage lying on the coffee table.[13]  Galliani went back outside to dial 911, but before she could dial, she spotted a New Castle County Police Department ("NCCPD") vehicle passing by.  She flagged it down.[14]  The police searched Amalfitano's residence; they too found no sign of Amalfitano.[15]  But they did find a black purse containing Amalfitano's wallet and cell phone.[16]  NCCPD initiated a missing-persons investigation.[17]

(5)  After calling Heck's cell phone several times with no answer, NCCPD went to his house.[18]  Upon arrival, the police saw Heck walking toward his car, a grey Subaru.[19]  As they approached him, the police noticed that he was shaking, his forearms were covered with scratch marks, and he had some additional scratch marks across his forehead.[20]  The police asked Heck if he knew of his girlfriend's whereabouts.[21]  Heck

---

[12] A402 (Tr. 123:17–22) (Donna Galliani).  Amalfitano's daughter testified that her mother and her mother's Australian shepherd were inseparable.  A389 (Tr. 110:10–21) (Alexandra Graney).

[13] A402–03 (Tr. 123:22–124:1) (Donna Galliani).

[14] A403 (Tr. 124:1–8) (Donna Galliani).

[15] A423 (Tr. 144:8–20) (Cpl. Franco Tassone).

[16] A417–18 (Tr. 138:22–139:21) (Officer Angelo Trapani).

[17] A376 (Tr. 97:16–21) (Det. Gino Cevallos).

[18] A456 (Tr. 25:4–16) (Officer Armelys Taveras-Jerez).

[19] A457 (Tr. 26:19–22) (Officer Armelys Taveras-Jerez).

[20] A458 (Tr. 27:7–18) (Officer Armelys Taveras-Jerez).

[21] A458 (Tr. 27:21–22) (Officer Armelys Taveras-Jerez).

responded by stating that Amalfitano was not his girlfriend.[22] The police found Heck's statement "concerning" as they had been told otherwise by Galliani.[23] After this encounter with Heck, the police considered him a person-of-interest in Amalfitano's disappearance.[24]

(6) The police continued their search for Amalfitano by collecting security camera footage from Amalfitano's New Castle County and Rehoboth Beach neighbors. The Rehoboth footage showed that on Sunday, September 24, around 7:12 p.m., Heck and Amalfitano loaded their belongings into Heck's Subaru and left the beach house.[25] At 10:55 p.m., Heck arrived at Amalfitano's residence without her.[26] Heck can be seen carrying one of Amalfitano's dogs into the residence.[27] Then, on Monday morning, Heck is captured on video leaving the residence in his Subaru.[28]

(7) The security footage did not account for the gap of time from when Heck and Amalfitano left the beach house to when Heck arrived at her residence. To determine what happened during this interval, NCCPD obtained Amalfitano's cell-site

---

[22] A807 (Tr. 150:5–13) (Det. Gino Cevallos).

[23] *Id.* (Det. Gino Cevallos); A81 (Aff. ¶ 12).

[24] A807, A812–13 (Tr. 150:2–13, 155:13–156:1) (Det. Gino Cevallos).

[25] A343–44 (Tr. 64:12–65:11) (David McMichael).

[26] A813–14 (Tr. 156:13–157:10) (Det. Gino Cevallos).

[27] A393 (Tr. 114:5–11) (Alexandra Graney).

[28] A817–18 (Tr. 160:17–161:10) (Det. Gino Cevallos).

location information ("CSLI") from her cell phone carrier.[29]  Amalfitano's CSLI

confirmed that her cell phone traveled from her beach house to her residence on Sunday

evening.[30]  And for one hour and thirty-seven minutes—from approximately 9:15 p.m.

until 10:52 p.m.—Amalfitano's cell phone was "relatively stationary" near Carousel

Park.[31]

    (8)    On Tuesday morning, September 26, NCCPD searched for Amalfitano in

Carousel Park.[32]  Before long, NCCPD discovered Amalfitano's lifeless body in a

ditch.[33]  Due to the battered condition of her body, the police converted their missing-

persons case into a murder investigation.[34]

---

[29] A472 (Tr. 41:12–22) (Det. Daniel Watson).  A cell phone is constantly scanning the surrounding area for the best signal, which is typically the closest cell tower.  A475–76 (Tr. 44:23–45:6) (Det. Daniel Watson); A837 (Tr. 14:3–16) (FBI Special Agent Michael Fowler).  CSLI can be used to determine a cell phone's general location at a given time.  A836–39 (Tr. 13:23–16:2) (FBI Special Agent Michael Fowler).  The precision of this information depends on the number of available cell towers and the size of the geographic area.

    After reviewing Amalfitano's CSLI, the police also reviewed security camera footage from two toll booth plazas in Dover and Middletown on Route 1.  A379–81 (Tr. 100:10–102:23) (Det. Gino Cevallos); A481–83 (Tr. 50:15–52:3) (Det. Daniel Watson).  This footage showed that, on Sunday at approximately 8:22 p.m., Heck and Amalfitano traveled through Dover Toll Plaza in his Subaru.  A381 (Tr. 102:1–11) (Det. Gino Cevallos).  And then at around 8:40 p.m., Heck and Amalfitano traveled through Middletown Toll Plaza.  A381 (Tr. 102:13–18) (Det. Gino Cevallos).

[30] A477–79 (Tr. 46:3–48:22) (Det. Daniel Watson).  Amalfitano's cell phone connected to her home Wi-Fi network at 11:46 p.m.  A817 (Tr. 160:9–14) (Det. Gino Cevallos).

[31] A478–79 (Tr. 47:4–48:17) (Det. Daniel Watson); A850–57 (Tr. 27:12–34:12) (FBI Special Agent Michael Fowler).

[32] A480 (Tr. 49:3–21) (Det. Daniel Watson); A493 (Tr. 62:2–8) (Det. Daryl Haines).

[33] A494–97 (Tr. 63:12–66:16) (Det. Daryl Haines).

[34] A605 (Tr 174:13–17) (Det. Ronald Phillips).  The chief medical examiner later determined that Amalfitano died from asphyxiation by strangulation.  A685–99 (Tr. 28:22–42:8) (Dr. Gary Collins).

(9)     The police obtained search warrants for Heck's residence, vehicle, person, and cell phone contents.[35] In searching Heck's residence, police found records showing that Heck had previously been arrested for domestic violence against Amalfitano.[36] When searching Heck's person, police found Heck's cell phone in one of his pockets.[37] And when searching Heck's Subaru, police found "reddish-brown" stains throughout its interior.[38] These stains were subjected to two types of presumptive serology tests to determine whether the stains were blood.[39] The two tests were the Bluestar latent bloodstain test (the "Bluestar test") and the reduced phenolphthalein blood test ("PPB

---

[35] A32–40 (Residence Warrant); A41–49 (Vehicle Warrant); A50–53 (Vehicle Warrant Return); A54–63 (2024 Body of Warrant); A64–73 (Cell Phone Warrant); A74–89 (Verizon CSLI Application). Of note, the Superior Court held Heck's motion to suppress evidence stemming from the warrant for his cell phone contents moot because the State did not seek to rely on the contents as evidence at trial. A261 (Super. Ct. Mem. Op. on Def.'s Mot. to Suppress at 23) [hereinafter "Mem. Op."].

[36] A212 (Suppression Hr'g Tr. 110:4–18) (Det. Gino Cevallos).

[37] A84 (Aff. ¶ 32).

[38] A597 (Tr. 166:4–9), A613 (Tr. 182:5–20) (Det. Ronald Phillips).

[39] Presumptive serology tests identify the possible presence of certain bodily fluids, such as blood. A588 (Tr. 157:15–20) (Det. Ronald Phillips) ("I will never say that 'that's blood' because I'm not a laboratory. I don't work in a laboratory."); A749–50 (Tr. 92:18–93:3) (Bethany Netta) ("So a presumptive test or a preliminary test just indicates the presence of something. It does not confirm that something is actually that. So in this case, a preliminary test for blood just indicates that it's possibly present, because the test itself is reacting to the presence of heme, which is in hemoglobin, which is in blood, but it is also in other items as well.").

test").[40] Both tests indicated that the stains possibly contained blood.[41] The police took DNA swabs of the stains. DNA testing on swabs confirmed the presence of Amalfitano's and Heck's DNA.[42]

(10) NCCPD also prepared a warrant application, supported by a 50-paragraph affidavit of probable cause, for Heck's CSLI. The affidavit contained information about the neighbors' security footage,[43] information derived from Amalfitano's CSLI and cell phone contents,[44] the results of the serology and DNA testing,[45] and Heck's history of domestic violence against Amalfitano.[46] Notably, one averment stated:

---

[40] The Bluestar test is a chemiluminescent substance sprayed onto a suspected blood stain that glows if the stain contains hemoglobin, the protein in red blood cells. A591–93 (Tr. 160:20–162:2) (Det. Ronald Phillips). The PPB test is another color-change test in which a chemical reagent is applied to a sample, and the reagent changes color if the sample contains hemoglobin. A765 (Tr. 108:7–22) (Bethany Netta).

[41] New Castle County Detective Ronald Phillips performed a Bluestar test on the stains in Heck's vehicle. A627 (Tr. 196:1–22) (Det. Ronald Phillips). NCCPD officers also collected swabs from the Subaru, Carousel Park, and some of Amalfitano's belongings for further DNA testing. A743–45 (Tr. 86:2–88:7) (Det. Gino Cevallos); A763–65 (Tr. 106:6–108:3) (Bethany Netta). Bethany Netta, a senior forensic DNA analyst at the Delaware Division of Forensic Science, tested the collected samples. She used presumptive blood tests and DNA testing. A749 (Tr. 92:8–14), A771–72 (Tr. 114:9–115:5) (Bethany Netta). The PPB test results indicated the possible presence of blood. A768–69 (Tr. 111:8–112:19) (Bethany Netta).

[42] A773–77 (Tr. 116:5–120:14) (Bethany Netta). Netta noted that she does not typically follow-up the presumptive test with a confirmation test because the DNA test she performs after the presumptive test will confirm if the blood is human; however, she will run a confirmation test if the DNA test fails to indicate the presence of human DNA. A767–68, A786, A789–90 (Tr. 110:7–111:7, 129:1–9, 132:8–133:3) (Bethany Netta).

[43] A82, A83 (Aff. ¶¶ 20, 22).

[44] A82, A83 (Aff. ¶¶ 21, 25, 26).

[45] A85 (Aff. ¶ 33).

[46] A81 (Aff. ¶ 14).

7

"persons who own and/or possess cellular phones often times have the phones on and/or near their person during the course of their travels throughout a given day."[47]

(11) The court granted the search warrant for Heck's CSLI.[48] The CSLI confirmed that Heck's cell phone had traveled with Amalfitano's cell phone from the beach house, to the vicinity of Carousel Park, and then back to Amalfitano's residence.[49] Heck's CSLI not only corroborated the camera footage from Amalfitano's neighbors but it also confirmed that Heck's phone remained at Amalfitano's residence overnight.[50] The police arrested Heck and charged him with Amalfitano's murder.[51]

(12) Before trial, Heck moved to suppress the evidence obtained under the CSLI search warrant and the results from the PPB test. Specifically, Heck argued that the CSLI warrant's supporting affidavit did not establish probable cause and that, therefore, the CSLI evidence should be suppressed.[52] Heck argued that the PPB test should be suppressed because, as a presumptive test, the results were unreliable under

---

[47] A85 (Aff. ¶ 38).

[48] A89 (Super. Ct. Order dated Sep. 29, 2023).

[49] A850–57 (Tr. 27:12–34:12) (FBI Special Agent Michael Fowler).

[50] A862 (Tr. 39:3–18) (FBI Special Agent Michael Fowler).

[51] A646 (Tr. 215:2–3) (Det. Gino Cevallos).

[52] A25–27 (Heck's Mot. to Suppress Evid. at 8–10).

Delaware Rule of Evidence 702 ("D.R.E. 702").[53] The Superior Court denied Heck's suppression motions and proceeded to trial.[54]

(13) At trial, the State presented several witnesses, including Delaware's Chief Medical Examiner, Dr. Gary Collins. Dr. Collins opined that Amalfitano likely died 12–24 hours before the police discovered her body.[55] He further opined that this range was only an estimate, and that the jury should not rely on it as a conclusive time of death.[56] During the State's closing argument, the prosecutor stated "Dr. Collins told you about the estimated time of death, somewhere around 24 to 30 to 12 hours, an estimate."[57] Heck did not object. The jury convicted Heck of first-degree murder, and the Superior Court sentenced him to life in prison.[58]

(14) Heck appealed to this Court, raising three claims. First, Heck contends that the Superior Court exceeded its discretion "in denying [his] motion to suppress in relation to the [] CSLI [w]arrant."[59] Second, Heck argues that the Superior Court "abused its discretion in denying [his] motion to exclude serology evidence."[60] Last,

---

[53] A267–72 (Heck's Mot. to Exclude Serology Evid. dated Oct. 24, 2024). Heck did not challenge the Bluestar test results in his motion to exclude the serology evidence.

[54] A265–66 (Mem. Op. at 27–28).

[55] A739–40 (Tr. 82:14–83:8) (Dr. Gary Collins) (noting that the range of when the victim is alive is "not that accurate").

[56] *Id.*

[57] A926 (Tr. 37:2–4) (State's Closing Arg.).

[58] *See* Opening Br., Ex. A (June 23, 2025) (Sent'g Order).

[59] *Id.* at 7.

[60] *Id.* at 12.

9

Heck claims, for the first time, that the State committed prosecutorial misconduct by intentionally misrepresenting Dr. Collins's time-of-death testimony during its closing argument.[61]

## STANDARD OF REVIEW

(15) We review "a trial court's denial of a motion to suppress after an evidentiary hearing challenging the sufficiency of a search warrant . . . for abuse of discretion."[62] Our review examines whether the search warrant "set[s] forth facts adequate for a neutral judicial officer to form a reasonable belief that an offense has been committed and that seizable property would be found in a particular place."[63] Similarly, we review the Superior Court's admission of evidence under D.R.E. 702 for abuse of discretion.[64] We review claims raised for the first time on appeal for plain error.[65]

## ANALYSIS

### A. The Cell-Site Location Information

(16) The Superior Court did not abuse its discretion when it declined to suppress Heck's CSLI. Absent exigent circumstances, the State must obtain a warrant

---

[61] *Id.* at 16.

[62] *Rybicki v. State*, 119 A.3d 663, 668 (Del. 2015).

[63] *Dorsey v. State*, 761 A.2d 807, 811 (Del. 2006).

[64] *Ayala v. State*, 204 A.3d 829, 835 (Del. 2019).

[65] *See, e.g.*, *Suber v. State*, --- A.3d ---, 2026 WL 184867, at *5–7 (Del. Jan. 15, 2026) (engaging in plain error review of a constitutional violation claim); *Morales-Garcia v. State*, --- A.3d ---, 2026 WL 278899, at *7 (Del. Feb. 3, 2026) (engaging in plain error review of a prosecutorial misconduct claim).

supported by probable cause to search an individual's CSLI.[66] "In determining whether probable cause has been demonstrated, there must be a logical nexus between the items sought and the place to be searched."[67] "The law is well established that probable cause to search a location for—or, in the case of CSLI, to demand—particular items or records is demonstrated where a totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found' thereby."[68] These determinations "must be premised on the information within the four-corners of the affidavit in support of a search warrant."[69]

(17)   Here, Heck argues that the affidavit supporting the warrant application did not establish probable cause because it failed to demonstrate a connection between Amalfitano's murder and Heck's CSLI.[70] Focusing on one averment in the affidavit – among fifty – Heck contends that the Superior Court improperly denied his motion to suppress on the basis that Heck was a suspect in the crime and that most people compulsively carry their cell phones.[71] At oral argument, Heck gave an example of

---

[66] *See Carpenter*, 585 U.S. at 316 ("the Government must generally obtain a warrant supported by probable cause before acquiring [CSLI] records").

[67] *Dorsey*, 761 A.2d at 811.

[68] *United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

[69] *State v. Holden*, 60 A.3d 1110, 1114 (Del. 2013). "This Court has also eschewed a hyper technical approach to the evaluation of the search warrant affidavit in favor of a common-sense interpretation." *Dorsey*, 761 A.2d at 811 (quoting *Gardner v. State*, 567 A.2d 404, 409 (Del. 1989)).

[70] Opening Br. 9.

[71] *Id.* at 9–11.

what he believed would satisfy the warrant requirement – "if there was a surveillance photo or surveillance video around the time of the crime or at the time of the crime that showed [the defendant] in possession . . . of the phone . . . ."[72]

(18) Heck asserts that *Dorsey v. State* supports his position and controls here.[73] We disagree. In *Dorsey*, police responded to a shooting where the victim was a boarder in one of the defendant's properties.[74] When the police were unable to find a firearm at the property, they applied for a warrant to search two automobiles owned by the defendant parked outside the property.[75] The Superior Court denied the defendant's motion to suppress, finding that the automobiles' connection to the crime could be inferred "given the nature of the crime and the items sought by [p]olice."[76] We reversed the Superior Court because the affidavit of probable cause did not connect the shooting to the defendant's vehicles.[77]

(19) Heck's situation differs from *Dorsey*. In the affidavit at issue here, we have an averment that Heck possessed his cell phone before leaving for the beach on

---

[72] Oral Arg. 7:25–7:39 (Jan. 21, 2026), https://courts.delaware.gov/supreme/oralarguments/.

[73] Opening Br. 8–10 (citing *Dorsey v. State*, 761 A.2d 807, 811 (Del. 2006)).

[74] *Dorsey*, 761 A.2d at 808–09.

[75] *Id.* at 809.

[76] *Id.* at 810.

[77] *Id.* at 809.

Saturday, the day before the murder;[78] Heck returned Saienni's phone call on Monday, September 25, the day after the murder;[79] and Heck had his cell phone when the police searched him.[80] In addition, the record contains video and photographic evidence showing that Heck was the last one seen with Amalfitano around 8:40 p.m., driving back from the beach house on Sunday evening,[81] and Heck arrived at her residence alone.[82] These averments establish the requisite "logical nexus" between Heck's CSLI and evidence related to Amalfitano's murder.[83] Even without the general averment that people compulsively carry their cell phones, there was sufficient probable cause within the four corners of the affidavit to conclude that Heck's CSLI would contain evidence relating to the crime.[84] Accordingly, we find that the Superior Court did not exceed its discretion in denying Heck's motion to suppress his CSLI.

---

[78] A83 (Aff. ¶ 25). The police verified that the phone number Amalfitano texted was the same phone number Heck gave to the police when they spoke with him on Monday, September 25, the day after Amalfitano's murder. *Id.*; A455–56 (Tr. 24:21–25:16) (Officer Armelys Taveras-Jerez).

[79] A82 (Aff. ¶ 17). Saienni had Heck's cell phone number stored in her cell phone's list of contacts. A361 (Tr. 82:6–14) (Sandra Saienni).

[80] A84 (Aff. ¶ 32).

[81] Heck and Amalfitano traveled through Middletown Toll Plaza. A381 (Tr. 102:13–18) (Det. Gino Cevallos).

[82] A813–14 (Tr. 156:13–157:10) (Det. Gino Cevallos).

[83] *State v. Holden*, 60 A.3d 1110, 1115 (Del. 2013).

[84] *Franks v. State*, 398 A.2d 783, 785 (Del. 1979) ("Excised of the alleged false paragraphs the warrant affidavit contains sufficient uncontested allegations to establish probable cause. . . .").

*B. The Serology Evidence*

(20)   Next, Heck argues that the Superior Court abused its discretion by allowing the Bluestar and PPB blood tests and the accompanying expert testimony into evidence.[85]  D.R.E. 702 provides that experts may testify if, among other factors, their "testimony is based on reliable principles and methods."[86]  D.R.E. 702 ensures that "any and all scientific testimony . . . is not only relevant, but reliable."[87]  In exercising its gatekeeping role, a trial court evaluating reliability may consider "testing, peer review, error rates, and 'acceptability' in the relevant scientific community."[88]  "The grounds for the expert's opinion merely have to be good, they do not have to be perfect."[89]  "Accordingly, admission of expert witness testimony requires reliability, not infallibility."[90]

(21)   Heck challenges the reliability of the blood tests under D.R.E. 702 because they are only presumptive tests and, in his view, unreliable.[91]  Because Heck conceded below that the PPB test had "been tested," "subjected to peer review," and generally

---

[85] Opening Br. 14.  Although the State did not proffer Detective Phillips as an expert before trial, the State conceded during trial that he would be providing expert testimony.  A440–41 (Tr. 9:13–10:11).  The Superior Court overruled Heck's objections to Detective Phillips' and Netta's expert testimony under D.R.E. 702.  A600 (Tr. 169:2–16).

[86] D.R.E. 702.

[87] *Rodriguez v. State*, 30 A.3d 764, 769 (Del. 2011) (citation omitted).

[88] *Id.* (citation omitted).

[89] *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994).

[90] *Ayala*, 204 A.3d at 834.

[91] Opening Br. 14–15.

14

accepted "in the forensic science community,"[92] his reliability challenge of the PPB test is limited to the error rates.[93] Heck did not argue at trial that the Bluestar test was unreliable under D.R.E. 702,[94] so our review of the Bluestar test's reliability is for plain error.[95] "Plain errors are 'material defects which are apparent on the face of the record, which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice.'"[96]

(22) The Bluestar and PPB tests and the accompanying expert testimony were sufficiently reliable for admission. D.R.E. 702 requires judges to ask a threshold gatekeeping question, "whether the testimony is the product of reliable principles and methods,"[97] not whether the methods supporting the testimony are 100% conclusive. Holding otherwise would replace D.R.E. 702's "reliability" requirement with "infallibility."[98] The experts' trial testimony about the procedures they used to administer the blood tests and that the tests are not conclusive is sufficient to overcome Heck's complained-of error. Accordingly, we find that the court did not plainly err or abuse its discretion in admitting the blood tests and the related testimony into evidence.

---

[92] A270 (Heck's Mot. to Exclude Serology Evid. ¶ 7).

[93] Opening Br. 14–15.

[94] Instead, Heck argued that Detective Phillips, who administered the Bluestar test and testified about the test, did not qualify as an expert. A600 (Tr. 169:2–10).

[95] *Suber*, 2026 WL 184867, at *5–7.

[96] *Id.* at *5 (quoting *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986)).

[97] *Ayala*, 204 A.3d at 835 (quoting D.R.E. 702(c)).

[98] *Id.* at 834.

## C. Prosecutorial Misconduct

(23) Finally, Heck argues that the State committed prosecutorial misconduct when it remarked in its closing argument about the timing of Amalfitano's death. Heck did not object to the statement during trial, nor did he raise this argument below; therefore, we review for plain error.[99]

(24) In a plain error review of prosecutorial misconduct, we perform a *de novo* review to determine whether misconduct occurred.[100] The State did not commit misconduct here. Heck argues that the prosecutor's statement—that Amalfitano died "somewhere around 24 to 30 to 12 hours, an estimate" before her body was discovered—was an intentional misstatement of the evidence that bolstered the State's theory of the case. A claim of prosecutorial misconduct may lie where a prosecutor intentionally misstates evidence presented to the jury during trial.[101] Heck's argument fails because, as read, the set of numbers is incomprehensible as a concrete timeframe. Therefore, the statement was most likely a mistake that was corrected mid-sentence. The lack of a trial objection from Heck supports this interpretation.

(25) Further, even if the statement were intentional, Heck does not satisfy the final *Suber* inquiry. The fourth step of the *Suber* analysis requires a showing that the

---

[99] *See Suber*, 2026 WL 184867, at *5–7.

[100] *Watson v. State*, 303 A.3d 37, 43 (Del. 2023) ("[W]e first engage in a *de novo* review to determine whether the prosecutor's actions rise to the level of misconduct . . . . only if we find misconduct would we engage in [a] plain error analysis."); *see also Suber*, 2026 WL 184867, at *5.

[101] *See Flonnory v. State*, 893 A.2d 507, 540 (Del. 2006).

error adversely affected Heck's "substantial rights by jeopardizing the fairness and integrity of the trial process."[102] Here, Heck remained unprejudiced. If Amalfitano was killed 30 hours before her body was discovered, as stated by the prosecutor, that would mean that she died on Monday morning. This timeline would contradict the State's theory of the case. The State's theory of the case required the jury to find that Heck killed Amalfitano on Sunday night because Heck's CSLI placed him at Amalfitano's residence 30 hours before the police discovered her body.[103] Moreover, Dr. Collins testified that his time-of-death range was only an estimate and should not be relied upon. The prosecutor's misstatement had no impact on the "fairness and integrity of the trial process."[104] Thus, we will not disturb Heck's conviction on this ground.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

*/s/ N. Christopher Griffiths*
Justice

---

[102] *Suber*, 2026 WL 184867, at *6.

[103] FBI Special Agent Fowler testified that Heck's CSLI indicated that Heck did not leave the residence after 11:47 p.m. on Sunday, September 24; he left at 8:00 a.m. on Monday, September 25. A861–62 (Tr. 38:17–39:18) (FBI Special Agent Michael Fowler). And Detective Cevallos testified that the neighbor's security camera did not capture anyone entering or leaving from the residence after Heck arrived Sunday night. A818 (Tr. 161:8–10) (Det. Gino Cevallos). Detective Haines testified that the police arrived at Carousel Park on Tuesday, September 26, around 8:45 a.m., and discovered Amalfitano's body shortly thereafter. A493 (Tr. 62: 2–8) (Det. Daryl Haines).

[104] *Id.*