# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

FOODLINER, )
          )
  Employer-Below/Appellant, )
          )
  v. ) C.A. No. N25A-02-003 KMV
          )
SCOTT HIDINGER, )
          )
  Employee-Below/Appellee. )

Submitted: June 12, 2025
Decided: September 30, 2025

## MEMORANDUM OPINION

*Upon Appeal from the Decision of the Industrial Accident Board*
**AFFIRMED**.

Geoffrey S. Lockyear, TYBOUT, REDFEARN & PELL, P.A., Wilmington, DE; *Counsel for Employer-Below/Appellant*.

Meghan Butters Houser, WEISS, SAVILLE, MEDINILLA & HOUSER, P.A., Wilmington, DE; *Counsel for Claimant-Below/Appellee*.

**VAVALA, J.**

1

## I. INTRODUCTION

This is an appeal from an Industrial Accident Board decision awarding workers' compensation benefits to an employee for injuries he sustained in a work-related accident. The employer's challenge is limited to the Board's award of compensation for an injury to the employee's lumbar spine/lower back with radiculopathy into his lower leg. The Court finds the Board's decision is well reasoned, supported by substantial evidence, and correct as a matter of law. Accordingly, the Board's decision is **AFFIRMED**.

## II. FACTS AND PROCEDURAL BACKGROUND[1]

It is undisputed employee-appellee Scott Hidinger ("Hidinger") was injured in a June 15, 2021 collision in Connecticut while driving a tractor trailer on behalf of Employer-appellant Foodliner (the "Accident").[2] In July 2022, the Industrial Accident Board ("Board") determined that injuries to Hidinger's hip, knee, and lower extremity were caused by the Accident and, thus, compensable workers' compensation claims.[3] On May 6, 2024, Hidinger filed two additional petitions with the Board: a Petition for Disfigurement, for permanent scars, and a Petition to

---

[1] The facts are taken from Docket Item ["D.I."] 6, Industrial Accident Board's Decision dated January 8, 2025 ["Decision"] and are based on the record developed at the November 19, 2024, Hearing ["Hearing"], D.I. 10. Citations to the Hearing Transcript are in the form "Tr. #."

[2] Decision at 2.

[3] *Id.* at 17.

Determine Additional Compensation Due, for a lumbar spine/low back injury with radiculopathy (collectively "Petitions").[4]  A hearing on the Petitions was held before the Board on November 19, 2024 ("Board Hearing").  Hidinger, as well as Hidinger's and Foodliner's medical experts, Dr. Xing and Dr. Murphy, testified via deposition.[5]

By decision dated January 8, 2025, the Board found Hidinger's disfigurement and lumbar spine/lower back injury were caused by the Accident and awarded compensation to him.[6]  Foodliner does not contest the Board's disfigurement award,[7] but appeals the Board's determination Hidinger's lumbar spine/lower back injuries were caused by the Accident and its concomitant award of additional compensation.[8]

Hidinger does not have memory of the Accident but remembers being pulled from the overturned truck.[9]  He was taken to an area hospital, bleeding from his

---

[4] *Id.* at 17; Tr. 3:11-14.

[5] D.I. 18, Exhibit C.

[6] Decision at 24.

[7] D.I. 15, Opening Brief of Employer-Appellant ["Foodliner OB"] at 4-5.  Hidinger was also awarded compensation for right lower extremity scarring, which Foodliner is not appealing. Decision at 2.

[8] Foodliner OB at 4-5.

[9] Decision at 3.

forehead and knee[10] and had 12 to 13 x-rays of various parts of his body.[11]  His right and left knees became infected and eventually required surgery.[12]

Hidinger completed a pain evaluation at the hospital emergency room ("ER") in Connecticut on the day of the Accident, as well as an injury report form ("Injury Report") provided by Foodliner on June 22, about a week after the accident.[13]  On the Injury Report, Hidinger indicated injuries to his head, left shoulder, left side, ribs, hip, and left leg.[14]  Hidinger followed up with his family doctor in Delaware the same day, and did not mention back pain as one of his symptoms;[15] nor was there mention of "any right-sided burning, stabbing or aching in the family physician's record, although [Hidinger] had indicated this on the pain diagram the same day."[16]

On July 6, 2021, Hidinger went to an ER again, this time in Delaware, complaining of lower back pain, pain in his right thigh, and numbness and burning

---

[10] *Id.* at 3.

[11] *Id.* at 5.

[12] *Id.*

[13] *Id.* at 4.

[14] *Id.* at 5.

[15] Decision at 4.

[16] *Id.* at 14.

in his foot.[17]  After a CT scan of his low back,[18] he was diagnosed with lumbar radiculopathy and his family doctor referred him to specialist Dr. Selina Xing.[19]

On July 29, Hidinger met with Dr. Xing.[20]  She ordered x-rays of the lumbar spine and SI joint and an EMG of the lower extremities.[21]  The EMG revealed a mild acute S1 radiculopathy on the right side.[22]  During a follow-up with Dr. Xing on August 24, Hidinger reported feeling the same as at his previous visit.  Dr. Xing's diagnosis continued to be lumbar sacral radiculopathy as confirmed by the EMG.[23]

Dr. Xing grew concerned about Hidinger's conservative treatment preferences because he was still reporting pain, and "he was experiencing radiculopathy that was interfering with his activity levels."[24]  Dr. Xing suggested injections to help alleviate some of his symptoms, but treatment for Hidinger's lower back was interrupted because his other injuries required more attention.[25]  Hidinger was hospitalized between November and December 2021 for a right lower extremity infection, again for left knee surgery in June 2022, and for hip replacement surgery in September

---

[17] Decision at 7.

[18] *Id*. at 6.

[19] *Id*. at 3

[20] *Id*. at 7.

[21] *Id*.

[22] *Id*.

[23] *Id*.

[24] Decision at 8.

[25] *Id*.

2022.[26] When Hidinger returned to Dr. Xing in January 2023, she started him on injection treatments at the L5-S1 level, to which he responded well, reporting almost 80 percent relief.[27]

At the Hearing, Hidinger recalled driving in Connecticut on I-95 and then being pulled out of the flipped over truck.[28] He did not remember how the accident happened or the accident itself.[29] Hidinger recalled being transported to a Connecticut emergency room where he was in a lot of pain,[30] bleeding from his forehead and left knee, and where he had a lot of x-rays performed.[31] A couple of weeks later, he began to notice pain in his lower back going down his right leg into his right foot for which he went to the ER in Delaware on July 6, 2021.[32] He followed-up with his family doctor the next day who then referred him to Dr. Xing.

### i. Dr. Xing's Testimony

Dr. Xing deposition testimony was offered at the Board Hearing.[33] She reiterated that Hidinger was admitted to the ER in Delaware complaining of "right

---

[26] Decision at 8.

[27] *Id.*

[28] *Id.*

[29] *Id*. at 16.

[30] *Id*.

[31] Tr. at 18.

[32] *Id*. at 20.

[33] D.I. 19, Ex. C, November 4, 2024, Deposition of Selina Xing, M.D. ["Xing Dep."]

thigh pain, foot numbness and mild low back pain and the foot numbness plus burning sensation . . . [and t]hey diagnosed him [with] lumbar radiculopathy."[34] On July 29, Dr. Xing examined Hidinger and noted the following clinical findings: "some tenderness to palpation with muscle spasms in the lumbar spine, paraspinals, some lumbar sacral junction, right SI joint tenderness [and] limited range of motion."[35] She ordered various tests, such as an EMG, that were completed on August 12, 2021, and showed "radiculopathy symptoms, mild acute radiculopathy on the right side."[36]

Hidinger returned to Dr. Xing on August 24 for a follow up and stated his pain remained the same.[37] Her assessment indicated Hidinger had lumbar sacral radiculopathy, as confirmed by the EMG and Hidinger's report of radicular pain symptoms. Dr. Xing then ordered a lumbar MRI, reasoning "because the EMG showed lumbar sacral radiculopathy . . . we order[ed an] MRI to see the details."[38] While the MRI did not indicate any radiculopathy, Dr. Xing explained, "sometimes [there are] non-mechanical pressures to irritate the nerve and the[re] can be chemical irritation. So that may not be exactly show[n] in the MRI findings[,] but his EMG is

---

[34] *Id.* at 9.

[35] *Id.* at 11.

[36] *Id.* at 13.

[37] *Id.* at 14.

[38] Xing Dep. at 15.

7

pretty conclusive."[39] Dr. Xing recommended injections to reduce Hidinger's pain and inflammation in his back,[40] but he was unable to receive them due to hospitalizations and surgeries to address his more serious injuries from the accident.[41]

Following surgeries on his hip and knee, Hidinger returned to Dr. Xing in January 2023.[42] Dr. Xing noted, "[He said he's worse. He still complains of low back pain . . . and at that point we started injections."[43] Dr. Xing testified Hidinger's response to the January 23, 2023, injections was "[g]reat;"—"he follow[ed]-up after [the] injection and . . . reported really good response . . . almost 80 percent relief."[44] A follow up EMG was performed on April 14, and "on that EMG it only showed sensory motor neuropathy of his lower extremity. It did not show any radiculopathy."[45] To explain why radiculopathy showed up on Hidinger's first EMG, but not the second, Dr. Xing testified, "[i]t could be over the time he had injections and he kind of calmed down some inflammation to make it healing to a

---

[39] *Id*. at 16.

[40] *Id*. at 18.

[41] *Id*.

[42] *Id*. at 20.

[43] *Id*. at 20-21.

[44] Xing Dep. at 21-22.

[45] *Id*. at 22.

certain point it won't show anymore."[46]  Another MRI was done in August 2024, which still showed L5-S1 facet joint arthritic changes.[47]  Dr. Xing noted that Hidinger had positive responses to almost all of the injections he received.[48]  Dr. Xing also pointed out there are no records that Hidinger suffered from any low back injuries prior to the Accident.[49]

Dr. Xing opined that Hidinger's low back/spinal injury with radiculopathy was casually related to the Accident of June 15, 2021:

> [B]oth his right leg pain and numbness, tingling, typically when people experience low back pain, leg pain and numbness and tingling usually its related to nerve issues. So from the EMG findings and his clinical presentations and his response to injections he does carry a diagnosis of right sided lumbar sacral radiculopathy.[50]

Dr. Xing incorrectly thought Hidinger marked his lower back on the initial Injury Report pain drawing,[51] but stated that Hidinger

> [had] a CAT scan of his abdomen and pelvis and it showed right flank contusion. Like initial intake from he also mark[sic] he has low back and right leg symptoms. And he saw his primary care Dr. Sarah Mullins and did mention about a right leg symptoms and back issues and was diagnosed as lumbar radiculopathy. These are all before he sees me.[52]

---

[46] *Id.*

[47] *Id.* at 23.

[48] *Id.*

[49] *Id.* at 33.

[50] Xing Dep. at 24-25.

[51] *Id.* at 26.  Hidinger did not indicate on the injury report that he had injured his back but did mark that his head, left shoulder, left side, ribs, hip, and left leg were injured. Tr. at 29.

[52] Xing Dep. at 28.

On cross-examination, Dr. Xing confirmed that Hidinger's medical records indicated that he is morbidly obese and such a diagnosis can cause back pain.[53] The medical records also indicated a diagnosis of peripheral vascular disease ("PVS"), "something that can cause pain or discomfort in the legs and feet."[54] But Dr. Xing maintained PVS presents different types of symptoms than lumbar radiculopathy.[55] Dr. Xing opined "but for the June 15, 2021 motor vehicle accident at work Mr. Hidinger would[sic] [not] have needed the treatment to the lumbar spine . . . including the injections, the diagnostic testing as well as the chiropractic and PT"[56] and "the treatment [Hidinger] has received since the work injury is reasonable, necessary and casually related to the accident."[57]

### ii.     Dr. Murphys Opinion

Foodliner's expert, Dr. William Murphy, testified that it is very important to his causation analysis to consider when a claimant's subjective complaint of injury is made, versus when the accident occurred.[58] Regarding Hidinger's back pain, Dr. Murphy noted there was nothing "in the EMT report list [of] either a complaint

---

[53] *Id.* at 35.

[54] *Id.* at 36.

[55] *Id.*

[56] *Id.* at 33-34.

[57] *Id.* at 34.

[58] D.I. 18, November 14, 2024, Deposition of William Murphy, D.O. ["Murphy Dep."] at 8.

regarding the lumbar spine or any type of diagnosis regarding the lumbar spine[.]"[59] He observed that Hidinger's family doctor had "no notes" relating to complaints or a diagnosis involving the lumbar spine initially; rather, the complaints were "essentially for his extremities and his injuries to his head."[60] Further, Dr. Murphy testified how, although Hidinger was referred to orthopedic doctors for injuries to his extremities, neither of those doctors noted complaints about the spine either.[61]

Prior to physically examining Hidinger, Dr. Murphy reviewed the diagnostic studies and physicians' notes. Dr. Murphy opined the July 6, 2021, CT scan did not evidence recent back injury—there was "no acute fracture or post traumatic subluxation . . . no disc herniation, no spinal stenosis or any neuroforaminal narrowing . . . [and] no evidence of any fracture, dislocation, and any disc abnormalities."[62] Regarding the family physician's July 7 physical examination and diagnosis of lumbar radiculopathy,[63] Dr. Murphy disagreed stating, "that's a normal examination of the spine without any evidence of abnormalities referable to the

---

[59] *Id.* at 10.

[60] *Id*. at 14.

[61] *Id*. at 15.

[62] *Id*. at 17-18.

[63] *Id*. at 40. *See also* Tr. at 62.

11

spine, including neurologic abnormalities that would be consistent with radiculopathy."[64]

After performing a physical exam of Hidinger in November 2021, Dr. Murphy stated, "Regarding the lumbar spine, I noted that [Hidinger] had essentially full active range of motion of the lumbar spine . . . [and he had] normal functional range of motion, yet he complain[ed] of pain at the end of those motions."[65] He also noted that Hidinger had no signs of muscular atrophy which can be seen in lumbar radiculopathy.[66] Dr. Murphy concluded

> [t]he findings regarding the lumbar spine were normal from a neurological and orthopedic standpoint. [Hidinger] had normal range of motion, normal strength, normal sensation, intact reflexes, no muscular atrophy, and negative nerve root tension signs from lumbar nerve irritation, radiculitis, or radiculopathy that would relate to lumbar disc disease. There were some subjective complaints of pain, but no objective abnormalities that substantiated those complaints.[67]

And Dr. Murphy opined Hidinger "did not sustain an injury to the lumbar spine referable to that incident"[68] and that "if there had been some lumbar complaints referable to th[e] incident, he would have expected contemporaneous complaints and contemporaneous treatment at the time of the incident, particularly in the emergency

---

[64] Decision at 54. *See also* Murphy Dep. at 19, 41-42.

[65] Murphy Dep. at 21-22.

[66] *Id*. at 22.

[67] *Id*. at 23.

[68] *Id*. at 27-28.

room or in the trauma center or within a short period of time of the incident."[69]  Dr. Murphy surmised Hidinger had "fully recovered from any and all injuries related to the work by the time he saw him in November 2021."[70]

### iii.    The Board's Decision and Findings of Fact

The Board determined Hidinger established his lumbar spine/low back injury, with radiculopathy into the right lower extremity, was caused by the Accident and granted Hidinger's Petition for additional compensation.[71]  In pertinent part, the Board stated

> [t]he initial imaging report from the hospital showed a CT scan of the chest, abdomen and pelvis. There was a soft tissue contusion in the right flank area. That indicates he definitely has a direct hit into the right side of the back. The mechanism is consistent with the low back injury itself.[72]

The Board credited Hidinger's testimony and found "Dr. Xing to be most convincing regarding causation of [Hidinger]'s low back and right lower extremity radiculopathy condition."[73]

Regarding the absence of complaints of back pain in the initial medical records, the Board reasoned that a patient presenting in an ER with emergent injuries,

---

[69] *Id*. at 29.

[70] Decision at 10.

[71] *Id*.  at 24. The Board also awarded eight weeks of compensation for disfigurement.  Foodliner does not challenge this award.

[72] Decision at 10.

[73] *Id*. at 16.

including pain, bleeding, and loss of consciousness might not have back pain at the forefront his mind.[74]  Specifically, the Board stated that:

> [Hidinger] was credible that he initially was in a lot of pain in various areas of the body, which likely delayed the recognition of trouble in and the focus of treatment of the low back. It was only in early July 2021 that he first learned that the low back was the cause of his right leg radicular symptoms . . .  [T]he Board did not feel that a three-week delay in reporting low back or lower extremity radiculopathy symptoms was unreasonable under circumstances where [Hidinger] had a multitude of symptoms involving various body parts to be sorted out following this work incident, including at least four more urgent bodily issues.[75]

Accordingly, the Board held "[a]fter a through review of the evidence, [Hidinger] has met his burden to show that he suffered a lumbar spine injury with radiculopathy in relation to the work accident."[76]

## III.  STANDARD OF REVIEW

The Superior Court exercises "appellate jurisdiction over final agency decisions under 29 *Del. C.* § 10142."[77]  This Court's "review of an Industrial Accident Board's decision is limited to an examination of the record for errors of

---

[74] *Id*. at 18.

[75] *Id*.

[76] *Id*. at 15-16.

[77] *Quality Assured Inc. v. David*, 2022 WL 17442738 (Del. Super. Dec. 6, 2022).

14

law and a determination of whether substantial evidence exists to support the Board's findings of fact and conclusions of law."[78]

This Court reviews the Board's legal conclusions *de novo* for errors in formulating or applying legal precepts.[79] The construction of a state statute is a legal issue.[80] "If there is no error of law and substantial evidence supports the Board's findings, the Board's decision must be affirmed."[81] Conversely, "[i]f the Board overrides or misapplies the law," this Court "will not hesitate to reverse."[82]

"Absent error of law, the standard of review for a Board's decision is abuse of discretion."[83] An abuse of discretion occurs when the Board's decision has "exceeded the bounds of reason in view of the circumstances, [or] so ignored

[78] *Powell v. OTAC, Inc.*, 223 A.3d 864, 870 (Del. 2019) (citing *Roos Foods v. Guardado*, 152 A.3d 114, 118 (Del. 2016)); *see also Gen. Motors Corp. v. Freeman*, 164 A.2d 686, 689 (Del. 1960); *Rosenblum v. City of Wilm.*, 2024 WL 3876630, at *1 (Del. Super. Aug. 20, 2024); *Johnson v. Canalfront Builders, LLC*, 2024 WL 862442, at *3 (Del. Super. Feb. 29, 2024), *aff'd*, 2024 WL 3886193 (Del. Aug. 21, 2024).

[79] *Zayas v. State*, 273 A.3d 776, 785 (Del. 2022) (citing *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 899 (Del. 1994)) (internal quotation marks omitted).

[80] *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 932 (Del. 2007) (citing *Page v. Hercules*, 637 A.2d 29, 32 (Del. 1994)) (construing worker's compensation statute).

[81] *Zayas*, 723 A.3d at 785 (quoting *Stevens v. State*, 802 A.2d 939, 944 (Del. Super. 2002) (internal citations omitted) and citing *Breeding v. Contractors-One-Inc.*, 549 A.2d 1102, 1104 (Del. 1988)).

[82] *Baxter v. Verizon Commn's*, 2024 WL 3581660, at *3 (Del. Super. July 30, 2024) (first citing *Pitts v. White*, 109 A.2d 786, 788 (Del. 1954); then citing *Ohrt v. Kentmere Home*, 1996 WL 527213, at *3 (Del. Super. Aug. 9, 1996); and then citing *City of Wilm. V. Clark*, 1991 WL 53441, at *3 (Del. Super. Mar. 20, 1991)).

[83] *Person-Gaines v. Pepco Hldgs., Inc.*, 981 A.2d 1159, 1160 (Del. 2009) (citing *Stanley v. Kraft Foods, Inc.*, 2008 WL 2410212, at *2 (Del. Super. Mar. 24, 2008)).

recognized rules of law or practice as to produce injustice."[84] The Board's practice

relating to the admission of evidence is generally less formal than courts of law.

Section 1331.14.3 of the IAB Regulations guides such procedures:

> The rules of evidence applicable to the Superior Court of the State of
> Delaware shall be followed insofar as practicable; however, that
> evidence will be considered by the Board which, in its opinion,
> possesses any probative value commonly accepted by reasonably
> prudent persons in the conduct of their affairs. *The Board may, in its
> discretion, disregard any customary rules of evidence and legal
> procedures so long as such a disregard does not amount to an abuse of
> its discretion.*[85]

Despite this flexible authority and even if "the Board's ultimate conclusion was

based, in part, on credibility findings of other witnesses, [if] the process was so

flawed that it is difficult for [this Court] to have confidence in the outcome[,]" this

Court may reverse.[86]

The Board's fact finding is reviewed under the substantial evidence standard.

Substantial evidence is defined as "such relevant evidence as a reasonable mind

---

[84] *Zayas*, 273 A.3d at 786 (quoting *Roos Foods*, 152 A.3d at 118 (alteration in original); *see e.g.*, *Abrahams v. Chrysler Grp., LLC.*, 44 A.3d 921, 2012 WL 1744270 (Del. May 11, 2012) (TABLE). In *Abrahams*, the Court ruled that the "IAB improperly permitted Chrysler's attorney to offer what amounted to expert testimony during her closing argument. This maneuver, defended before this Court as a tactical decision, violated fundamental notions of fairness by depriving Abrahams of the opportunity to dispute the facts material to the outcome of his case." *Id.* As a result, the Court determined that this case represented an abuse of discretion. *Id.*

[85] *Zayas*, 273 A.3d at 785 (quoting 19 *Del. Admin. C.* § 1331-14.3) (emphasis in original).

[86] *Id.* at 780.

might accept as adequate to support a conclusion."[87]   Put differently, substantial evidence is "more than a scintilla but less than a preponderance of the evidence."[88] Importantly, this Court "must give deference to the 'experience and specialized competence of the Board' and must take into account the purposes of the Worker's Compensation Act.  These restrictions are in part due to the 'critical advantage' the Board has in its ability to observe the testimony of the live witnesses."[89]   In this context, it is not this Court's province to independently weigh the evidence, determine questions of credibility, or make  its own factual findings,[90] but rather, to "view the record in the light most favorable to the prevailing party below."[91]  Further, "[t]here is a presumption in favor of validity of the Board's decision and the burden of showing the error rests with the party raising the objection to such decision."[92]

---

[87] *Fowler v. Perdue, Inc.*, 2024 WL 3196775, at *8 (Del. 2024) (citing *Zayas,* 273 A.3d at 785 (cleaned up).

[88] *Powell*, 223 A.3d at 870 (quoting *Noel-Liszkiewicz v. La-Z-Boy*, 68 A.3d 188, 191 (Del. 2013)); *id.* at 871 ("[T]his factual finding depends in large measure on the Board's assessment of the credibility of the witnesses who testify before it. It is the exclusive function of the Board to evaluate the credibility of witnesses") (citing *Hardy v. E. Quality Vending*, 2015 WL 2378903, at *6 (Del. Super. May 12, 2015)).

[89] *Foraker v. Amazon.com, Inc.*, 2022 WL 599047, at *3 (Del. Super. Feb. 9, 2022) (first quoting *Phoenix Steel Corp. v. Garton*, 1980 WL 687396, at *2 (Del. Super. July 25, 1980); then citing *Histed v. E.I. Du Pont de Nemours & Co.*, 621 A.2d 340, 342 (Del. 1993); and then quoting *Butler v. Speakman Co.*, 1992 WL 276449, at *2 (Del. 1992)).

[90] *Kelley v. Perdue Farms*, 123 A.3d 150, 153 (Del. Super. 2015) (citing *Bullock v. K-Mart Corp.*, 1995 WL 339025, at *2 (Del. Super. May 5, 1995)).

[91] *Wyatt v. Rescare Home Care*, 81 A.3d 1253, 1258–59 (Del. 2013) (citing *Steppi v. Conti Elec., Inc.*, 991 A.2d 19 (Del. 2010) (TABLE)).

[92] *Foraker*, 2022 WL 599047, at *3 n.40 (citing *Phoenix Steel Corp. v. Garton*, 1980 WL 687396, at *2 (Del. Super. July 25, 1980)).

## IV. DISCUSSION

The questions pending before this Court on appeal are whether the Board's factual findings are supported by substantial evidence and its conclusions are free from legal error. Foodliner argues that the Board's findings of fact are not supported by substantial evidence and that it erred as a matter of law in granting Hidinger's petition for compensation for treatment of his lumbar spine. Viewing the record in a light most favorable to the prevailing party below, the Court disagrees and concludes that the Board's findings of fact are properly supported by substantial evidence in the record, and its legal conclusions are correct as a matter of Delaware law.

Foodliner's primary contention on appeal is that the Board should not have credited Dr. Xing's testimony and relied upon her expert opinion regarding causation because both rested on flawed or erroneous facts. Conversely, Hidinger asks this Court to affirm because the Board appropriately credited Hidinger's testimony and Dr. Xing's opinion regarding causation based upon substantial evidence in the record.[93]

Foodliner's argument focuses on Delaware Rule of Evidence 702(b) which states, in part, that an expert witness may offer an opinion if the testimony is based

---

[93] Answering Brief of Employee-Appellee, D.I. 19 ["Hidinger AB"].

18

on sufficient facts or data.[94] Foodliner contends that Dr. Xing's opinion fails to meet that standard because: 1) she erroneously thought Hidinger indicated back pain on the Injury Report and 2) she erroneously thought Hidinger reported to the ER for back pain three days after the accident—when it was actually closer to three weeks.[95] Foodliner argues that because Dr. Xing's causation opinion relied these two erroneous facts, it was flawed—thus, the Board's reliance upon it was an abuse of discretion and a clear error of law.[96] Foodliner's argument is unpersuasive.

First, as a preliminary matter, it does not appear Foodliner ever objected, invoked Rule 702(b), or moved the Board to exclude Dr. Xing's testimony or opinion during the Board Hearing. Second, even if it had, this Court cannot conclude the Board erred as matter of law or abused its discretion under Rule 702(b) by allowing or crediting Dr. Xing's testimony and opinion. Section 1331.14.3 of the IAB Regulations does not require strict adherence to "customary rules of evidence and legal procedures."[97] Moreover, an expert's qualification under Rule 702 does not require perfection.[98] It requires a trial judge to act as a gatekeeper to ensure that

---

[94] Foodliner OB at 13 (citing Delaware Rule of Evidence ["DRE"] 702). It should be noted that a portion of DRE 702 is inexplicably omitted in Foodliner's brief.

[95] Foodliner OB at 13-14.

[96] *Id*. at 13.

[97] *Zayas*, 273 A.3d at 785 (quoting 19 *Del. Admin. C.* § 1331-14.3) (emphasis in original).

[98] *Ayala v. State*, 204 A.3d 829, 834 (Del. 2019) ("[The] admission of expert testimony requires reliability, not infallibility."); *id.* (quoting *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 744

expert testimony is not only relevant, but reliable.[99]  And the danger of allowing such evidence is diminished where, as here, the matter is akin to a bench trial because "the judge can consider any shortcomings in the expert's testimony that are drawn out through cross-examination."[100]

Consistent with this premise, as the finder of fact and decider of credibility in workers' compensation matters, "it is exclusively the board's role to resolve conflicts in testimony and to weigh the credibility of each witness."[101]  The Board did just that.  During summation, Foodliner's counsel argued the Board should credit the Dr. Murphy's opinion regarding causation—rather than Dr. Xing's—based upon the discrepancies between her understanding of the facts and other documents in the record.[102]  The Board had the issue of Dr. Xing's credibility squarely before it—and specifically chose to credit her.

In applying the abuse of discretion standard, this Court declines, as it has done before, to "supplant itself as the trier of fact in this case, a role the law clearly

(3d Cir. 1994)) ("the grounds for the expert's opinion merely have to be good[;] they do not have to be perfect.").

[99] *Ayala*, 204 A.3d at 834 (citing *M.G. Bancorporation, Inc. v. LeBeau*, 737 A.2d 513, 521-22 (Del. 1999)).

[100] *In re Delaware Public Schools Litigation,* 239 A.3d 451, 501 (Del. Chan. 2020) (citations omitted).

[101] Hidinger AB at 26 (quoting *Playtex Prods., Inc. v. Leonard*, 2002 WL 31814637 (Del. Super. Nov. 14, 2002)).

[102] Tr. at 74.

prohibits the Court from assuming in its appellate capacity."[103]  Instead, "The Board [wa]s free to more readily accept or give greater weight to the credibility of one witness over another, if it is supported by substantial evidence."[104]  That Dr. Xing mistakenly believed that Hidinger had marked his lower back on the Injury Report does not mean her opinion or testimony failed to rely on sufficient facts or data; nor does the discrepancy regarding when Hidinger first sought treatment.  Dr. Xing was Hidinger's treating physician, and her testimony recounts multiple physical examinations over the course of three years, beginning approximately three weeks after the accident, physically examining Hidinger, running tests including MRIs and EMGs, and discussing and providing treatment over that time.  And Dr. Xing's clinical findings were consistent with the testimony of Hidinger regarding his subjective symptoms following the Accident.  The Board also thoroughly explained its reasoning for finding causation, notwithstanding the absence of early reports of back pain.  In sum, the Court finds the Board did not err as a matter of law in admitting and crediting Dr. Xing's opinion, and substantial in the record supports the Board's determinations.

---

[103] *Roeben v. James Jullian, Inc. of Delaware,* 2021 WL209865, at *4 (Del. Super. Feb. 16, 2001) (denying an employer's request to exclude testimony of expert under DRE 702).

[104] *Playtex*, 2002 WL 31814637, at *4.

## V.    CONCLUSION

The Board's factual findings regarding the type and extent of Hidinger's injuries are based upon substantial evidence in the record and its conclusions of law regarding causation are consistent with Delaware jurisprudence.  Accordingly, the Board's Decision granting Hidinger compensation for injuries sustained to the lumbar spine is hereby **AFFIRMED**.

**IT IS SO ORDERED.**

/s/ *Kathleen M. Vavala*
The Honorable Kathleen M. Vavala